IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAHLIL WILLIAMS | CRIMINAL ACTION<br><br>NO. 23-540-KSM-1 |

MEMORANDUM

**MARSTON, J.**                                                                                         July 31, 2025

Defendant Jahlil Williams has been charged with possession with intent to distribute marijuana and aiding and abetting, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D) and 18 U.S.C. § 2; possession of a firearm in furtherance of a drug trafficking crime and aiding and abetting, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2; and possession of counterfeit currency and aiding and abetting, in violation of 18 U.S.C. §§ 472 and 2.  (Doc. No. 1.) Defendant now moves to suppress the "evidence located inside the Ford Fusion"—i.e., the marijuana, firearm, currency, and his iPhone—on which these charges are based, arguing that this evidence was obtained through an illegal stop of that vehicle, in which Defendant was a passenger.  (Doc. Nos. 81, 91.)  The Government opposes the motion.  (Doc. No. 82 at 9–17.)

The Court held an evidentiary hearing on Defendant's motion to suppress on July 14, 2025.  During the hearing, Special Agent ("SA") Ryan McAdams of the United States Secret Service testified on behalf of the Government.  The Government also introduced several photos and videos posted from the Instagram accounts of Defendant and his co-defendant, Germaine Lewis, during August 2020.  (Gov't Hr'g Exs. 1–10.)

For the reasons discussed below, the Court denies Defendant's motion.

I.      **FACTUAL BACKGROUND**

Beginning in approximately December 2019, the Safe Streets and Gang joint task force[1] began investigating the "OMERTA" gang. (July 14, 2025 Hr'g Tr. 3:19–4:11, 4:17–5:7, 6:1–14.) As part of that investigation, PPD Officer Ryan Clement monitored various social media accounts of known "OMERTA" members, including the Instagram accounts of Defendant and co-defendant Lewis. (*Id.* 5:17–6:12, 11:2–6, 20:23–21:15.) Through that monitoring, Officer Clement observed that during the week leading up to August 19, 2020, a photo and video of bulk quantities of marijuana and a video advertising unspecified drugs for sale were posted on Defendant's Instagram page. (*Id.* 11:7–22, 12:25–15:4; Gov't Hr'g Exs. 1–3.) Additionally, photos and videos depicting another "OMERTA" gang member, Biheis Moore, possessing bulk quantities of marijuana and a firearm, as well as a video of a young boy possessing a firearm,[2] were posted on Lewis's Instagram page. (July 14, 2025 Hr'g Tr. 15:5–20:2; Gov't Hr'g Exs. 4–6.) Based on their review of this Instagram activity, law enforcement believed that Moore was seated in the passenger seat of a Ford Fusion and that the young boy was holding a firearm that looked similar to the firearm that Moore was pictured holding. (July 14, 2025 Hr'g Tr. 16:10–15, 18:9–15, 19:7–23; *compare* Gov't Hr'g Ex. 5 *with* Gov't Hr'g Exs. 4, 6.)

Also during the week leading up to August 19, Officer Clement observed a series of text images posted on Lewis's Instagram page, which, according to SA McAdams's testimony, were meant to antagonize a rival gang to come to a certain building with a red door used by Lewis on 22nd and Somerset Streets in Philadelphia. (July 14, 2025 Hr'g Tr. 21:16–23:20, 24:6–24,

---

[1] The Federal Bureau of Investigation ("FBI") runs this task force, with assistance from the United States Secret Service and the Philadelphia Police Department ("PPD"). (July 14, 2025 Hr'g Tr. 3:19–4:11, 5:8–12.)

[2] The video of the young boy shows him pointing the firearm. (Gov't Hr'g Ex. 6.) It also has a description that states, "Got my yb [young boy] in training." (*Id.*; July 14, 2025 Hr'g Tr. 19:7–20:2.)

26:21–29:1; Gov't Hr'g Exs. 7–10.)  During that same timeframe, Officer Clement watched City of Philadelphia surveillance cameras positioned near 22nd and Somerset Streets and observed various "OMERTA" members entering and exiting a building with a red door as well as a black Ford Fusion parked in that area.  (July 14, 2025 Hr'g Tr. 23:7–13, 23:22–24:5, 29:17–23.)

On August 19, Officer Clement, through the City of Philadelphia surveillance cameras, observed two individuals enter a black Ford Fusion parked near the building with the red door. (*Id.* 29:17–23, 49:1–50:2.)  At approximately 6:00 p.m. that day, two law enforcement teams set up physical surveillance around 22nd and Somerset Streets in unmarked vehicles.  (*Id.* 29:5–30:15, 34:22–24.)  While conducting surveillance, SA McAdams observed the Fusion, which had tinted windows, drive from 22nd and Somerset Streets to 19th and Somerset Streets and park on the 2700 block of 19th Street.  (*Id.* 30:20–31:16, 32:9–18.)  Law enforcement requested a marked PPD patrol vehicle to conduct a traffic stop of the Fusion.  (*Id.* 30:17–32:2.)

The marked patrol vehicle arrived and activated its emergency lights and siren as it approached the parked Fusion.  (*Id.* 32:3–8.)  Two PPD officers exited their vehicle and walked toward each side of the Fusion.  (*Id.* 32:19–23.)  But as the officers approached, the driver of the Fusion sped away southbound on 19th Street.  (*Id.* 32:19–33:1.)  A high-speed chase ensued during which one marked and two unmarked law enforcement vehicles attempted to stop the Fusion.[3]  (*Id.* 32:15–34:8.)  SA McAdams testified that at one point during this chase, the Fusion was driving at least eighty miles per hour away from the law enforcement vehicles.  (*Id.* 33:7–13.)  During this high-speed chase, SA McAdams observed the Fusion drive through multiple stop signs and red traffic lights without stopping and heard over the radio that the Fusion then drove the wrong way down a one-way street, the 2200 block of North Van Pelt Street.  (*Id.*

---

[3] SA McAdams described the area in which the high-speed chase occurred as a residential area where the speed limit is generally twenty-five miles per hour.  (*Id.* 33:2–6.)

3

33:10–13, 33:22–34:8.)  Gunshots were fired at the Fusion while it drove the wrong way down the 2200 block of North Van Pelt Street, which caused it to crash into multiple parked vehicles on that block.  (*Id.* 33:22–34:21.)  After the Fusion crashed, both occupants exited through the driver's side door[4] and fled the scene on foot.  (*Id.* 35:1–37:20.)  Officer Mendoza and SA McAdams were only able to catch Defendant as he was running away, and he was placed under arrest.  (*Id.* 37:11–20.)

While Officer Mendoza and SA McAdams chased Defendant and the driver, later identified as Lewis, other law enforcement officers observed a firearm, currency, and bulk quantities of marijuana in plain view inside the crashed car.[5]  (*Id.* 38:1–24.)  Law enforcement obtained a search warrant for the car,[6] and during the execution of that search warrant, law enforcement seized, among other items, a Glock model 19, 9mm semi-automatic pistol loaded with fifteen live rounds of ammunition, counterfeit currency, bulk quantities of marijuana, and an iPhone later determined to belong to Defendant.  (*Id.* 38:1–39:5, 72:6–8; *see* Doc. No. 1.)

## II.  LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  To invoke this protection, a defendant challenging a search or seizure through a motion to suppress bears the burden of establishing that his Fourth Amendment rights were violated.  *See United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011); *United States v. Stearn*, 597 F.3d 540,

---

[4] Both Lewis and Defendant exited the Fusion through the driver's side door after the crash because the passenger's side door had crashed into the parked cars.  (*Id.* 35:12–36:5.)

[5] When Lewis and Defendant fled, they left the driver's side door and a back window open in the crashed Fusion.  (*See id.* 38:1–24.)

[6] Law enforcement later determined that the Fusion was an overdue rental vehicle from Enterprise registered to a female individual.  (*Id.* 39:6–14, 39:22–41:17.)

551 (3d Cir. 2010). This requires the defendant to prove that he has "an actual or subjective expectation of privacy in the subject of the search or seizure" and "this expectation of privacy is objectively justifiable under the circumstances." *Free Speech Coalition, Inc. v. Att'y Gen. of the U.S.*, 677 F.3d 519, 543 (3d Cir. 2012); *see Minnesota v. Olson*, 495 U.S. 91, 95–96 (1990) ("[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment had a legitimate expectation of privacy in the invaded place. A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable." (internal quotations and citations omitted)).

Once the defendant has established standing to bring a Fourth Amendment challenge, the burden shifts to the Government to show that the challenged search or seizure was reasonable. *See Correa*, 653 F.3d at 190; *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). The Government must satisfy this burden by a preponderance of the evidence. *See United States v. Bey*, 911 F.3d 139, 145 (3d Cir. 2018).

"Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)). However, "a warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018). Further, "under the exception to the warrant requirement established in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968), 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "Any evidence obtained

pursuant to an investigatory stop . . . that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

## III.   DISCUSSION

Defendant moves to suppress all the evidence recovered from the Fusion as fruit of an unlawful seizure of Defendant as a passenger in that vehicle. (Doc. Nos. 81, 91.) He argues that there was no reasonable suspicion justifying the attempted *initial* stop of the Fusion while it was parked around 19th and Somerset Streets. (Doc. No. 81 at 4–5.) And Defendant claims that because the attempted initial unlawful stop *prompted* the subsequent flights that ended in the recovery of the marijuana, firearm, counterfeit currency, and Defendant's iPhone from the Fusion, that evidence must be suppressed as fruit of the poisonous tree.[7] (*Id.*)

In response, the Government contends that Defendant was not "seized" within the meaning of the Fourth Amendment during the attempted stop.[8] Rather, it was only after Defendant first fled as a passenger in the Fusion, which sped through residential streets, disregarded stop signs and traffic lights, and crashed into parked cars, and then fled on foot and

---

[7] Defendant does not independently challenge the legality of his arrest, i.e., that law enforcement lacked probable cause to arrest Defendant after he fled from 19th and Somerset Streets in the Fusion and then fled on foot from the scene of the Fusion's crash. (*See* July 14, 2025 Hr'g Tr. 75:24–77:9; *see generally* Doc. Nos. 81, 91.)

[8] The Government also argues that if the attempted initial stop amounts to a seizure, then there was reasonable suspicion justifying that stop based on law enforcement's monitoring of Lewis's and Defendant's recent Instagram activity, which indicated drug and firearm possession linked to a Ford Fusion, law enforcement's City surveillance camera monitoring, which revealed a Fusion in the location referenced in Lewis's Instagram activity, and the PPD officers' observation of the Fusion's illegally tinted windows while approaching the Fusion on August 19. (*See* Doc. No. 82 at 10–17; July 14, 2025 Hr'g Tr. 23:7–13, 23:22–24:5, 29:17–23.) As explained below, the Court need not determine whether reasonable suspicion existed to support the attempted initial stop of the Fusion, since that stop was not a "seizure" within the meaning of the Fourth Amendment.

was ultimately caught by law enforcement, that Defendant was "seized." (Doc. No. 82 at 11–17.) And, at that point, there was probable cause to place Defendant under arrest. (*Id.*)

Here, the Court agrees that Defendant was not "seized" within the meaning of the Fourth Amendment during the attempted initial stop. Accordingly, the Court denies Defendant's motion to suppress the evidence ultimately recovered from the Fusion as fruit of an unlawful seizure.

### A.     Defendant has standing to challenge his seizure as a passenger in the Fusion.

The Court first addresses the Government's argument that Defendant lacks standing to challenge "any stop or search" of the Fusion because he was neither the driver nor the owner of that car. (Doc. No. 82 at 9–10.) The Government misunderstands the nature of Defendant's Fourth Amendment challenge, which is premised not on an illegal search of the Fusion, but rather the initial illegal stop of the Fusion and resulting seizure of Defendant, pursuant to which evidence in the Fusion was eventually discovered. (*See* Doc. No. 81 at 4–5; Doc. No. 91 at 5–6.) "[W]here, as here, a defendant is arguing that police officers executed a traffic stop in an unreasonable and unlawful manner, 'the violation of [the defendant's] Fourth Amendment rights was the traffic stop itself, and it is settled law that a traffic stop is a seizure of everyone in the stopped vehicle.'" *Jackson*, 120 F.4th at 1219 (quoting *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006)); *see Brendlin v. California*, 551 U.S. 249, 251 (2007) ("When a police officer makes a traffic stop . . . . a passenger is seized as well and so may challenge the constitutionality of the stop."); *Mosely*, 454 F.3d at 253 ("[P]assengers in an illegally stopped vehicle have 'standing' to object to the stop, and may seek to suppress the evidentiary fruits of that illegal seizure under the fruit of the poisonous tree doctrine."). The Court thus finds that Defendant has standing to assert his Fourth Amendment claim based on the officers' seizure of Defendant as a passenger in the Fusion.

### B.  Defendant was not seized until he was arrested by law enforcement during the foot chase.

Because "there can be no Fourth Amendment violation until a seizure occurs," the Court must first determine whether and when Defendant was seized within the meaning of the Fourth Amendment. *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000); *see Brown*, 448 F.3d at 245 ("We begin by determining when the seizure of Brown occurred, as that is the moment 'the Fourth Amendment becomes relevant.'" (quoting *Terry*, 392 U.S. at 16)).  "A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" *Brown*, 448 F.3d at 245 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).  Accordingly, "when a seizure is effected by even 'the slightest application of physical force,' it is immaterial whether the suspect yields to that force." *Id.* (quoting *Hodari D.*, 499 U.S. at 625–26.  But "if a suspect in the absence of physical force does not submit to an officer's show of authority, there is no seizure and no Fourth Amendment claim." *Id.*; *see Brendlin*, 551 U.S. at 254.

"[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Brown*, 448 F.3d at 245–46 (quoting *Hodari D.*, 499 U.S. at 628).  And submission to such a show of authority "requires at minimum, that a suspect manifest compliance with police orders." *United States v. Amos*, 88 F.4th 446, 454 (3d Cir. 2023) (quoting *United States v. Smith*, 575 F.3d 308, 312 (3d Cir. 2009)).

Defendant only contests the legality of the PPD officers' *initial* encounter with the parked Ford Fusion around 19th and Somerset Streets.  (*See* Doc. No. 81 at 4–5.)  During that encounter, the officers arrived in their marked patrol vehicle and activated their emergency lights and siren.

(July 14, 2025 Hr'g Tr. 32:3–8.)  The officers got out of their vehicle and walked toward the Fusion, but before they got to the car, Lewis sped away.  (*Id.* 32:19–23.)  A high-speed chase by multiple law enforcement vehicles ensued, during which the Fusion travelled up to at least eighty miles per hour through a residential area, failed to stop at stop signs and red lights, and eventually drove the wrong way down the 2200 block of North Van Pelt Street, a one-way street.  (*Id.* 32:24–33:13, 33:22–34:8.)  The Fusion crashed into multiple parked cars on that block.  (*Id.* 34:13–21.)  The driver and passenger, later identified as Lewis and Defendant, escaped through the driver's side door and ran.  (*Id.* 35:22–36:5.)  Law enforcement was unable to catch Lewis but ultimately apprehended Defendant.  (*Id.* 35:22–37:20.)

"[N]ot every encounter between the police and a citizen constitutes a seizure within the meaning of the Fourth Amendment."  *United States v. Williams*, 413 F.3d 347, 352 (3d Cir. 2005).  The PPD officers' approach and attempted stop of the occupants of the parked Ford Fusion is one encounter that does not rise to the level of a constitutional seizure.  The officers did not apply any physical force to the Fusion or its occupants during that initial encounter, and even

assuming the encounter amounted to a show of authority,[9] the occupants of the Fusion did not demonstrate their submission to that show of authority when they immediately fled. *See, e.g.*, *Brendlin*, 551 U.S. at 254 ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned."); *Amos*, 88 F.4th at 455 (concluding that defendant's "one-or-two second pause and halfway hand raise [before fleeing] did not manifest submission" to uniformed officer's show of authority by approaching defendant from a marked police car and commanding him to stop and show his hands, such that defendant was not seized until the officers later caught and handcuffed him after he fled). Therefore, Defendant cannot invoke the protections of the Fourth Amendment based on this initial encounter with the PPD officers as they approached the car parked around 19th and Somerset Streets. *See Brown*, 448 F.3d at 245; *Valentine*, 232 F.3d at 358.

Defendant was only seized once he was physically caught and arrested after he fled on foot following the high-speed chase and crash. *See Brown*, 448 F.3d at 245; *Amos*, 88 F.4th at

---

[9] While "the threatening presence of several officers" and "the display of a weapon by an officer" are "[e]xamples of circumstances that might indicate a seizure," *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), officers' "[m]erely approaching an individual, whether standing or in an automobile, does not constitute a seizure under the Fourth Amendment, *Williams*, 413 F.3d at 354. *See, e.g.*, *Williams*, 413 F.3d at 352–54 (holding that police officers' approach of defendant seated in his parked van did not constitute a seizure, where there was no use of physical force and there was no show of authority when the officers approached the van in their marked vehicle, exited the vehicle, and approached the parked van on foot"); *United States v. Bowra*, No. 16-cr-161, 2018 WL 1244521, at *15–16 (W.D. Pa. Mar. 9, 2018) (concluding that officer's pulling up behind parked vehicle in which defendant was a passenger in a marked patrol vehicle with emergency lights activated "constituted a mere encounter that did not ripen into a seizure for Fourth Amendment purposes until [the officer] ordered [d]efendant to stay seated in the vehicle"); *United States v. Gardenhire*, No. 15-cr-87, 2017 WL 1022578, at *6–7 (W.D. Pa. Mar. 16, 2017) (finding that defendant was not seized when detectives approached a parked vehicle in which he was sitting, shining flashlights into that vehicle, and asking defendant to stop reaching toward the cupholder and keep his hands in sight). Here, it is not clear whether the PPD officers had drawn their guns as they walked toward the parked Fusion (*see* July 14, 2025 Hr'g Tr. 32:19–23), but even assuming they did, the evidence clearly establishes that the occupants of the Fusion did not submit to that show of authority.

455 (determining that defendant was not seized until he was caught and put into handcuffs—"a classic seizure"—after fleeing from an officer who approached him and commanded him to stop and show his hands).  Because Defendant's Fourth Amendment claim rests solely on the purported illegality of the officers' *initial* encounter of the parked Fusion, which merely amounts to an attempted seizure, his claim must fail.[10]

## IV.     CONCLUSION

For the reasons set forth above, the Court denies Defendant's motion to suppress.  An appropriate Order follows.

---

[10] Curiously, though not argued in his briefing, Defendant was not willing to concede during the evidentiary hearing that if he was not seized until after he fled on foot following the high-speed chase and crash, then there was probable cause for his arrest.  (*See* July 14, 2025 Hr'g Tr. 77:21–78:12.)  Here, the Court finds there was probable cause to arrest Defendant once he fled from the crash scene where bulk quantities of marijuana and a firearm were in plain view inside the crashed Fusion.  (*See id.* 38:1–24.)  *See, e.g.*, *United States v. Navedo*, 694 F.3d 463, 474 (3d Cir. 2012) ("Unprovoked flight can [ ] elevate reasonable suspicion to probable cause if police have 'reasonably trustworthy information or circumstances' to believe that an individual is engaged in criminal activity." (quoting *United States v. Laville*, 480 F.3d 187, 194 (3d Cir. 2007))); *Laville*, 480 F.3d at 195 ("It is well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest." (internal quotation omitted)); *United States v. Reid*, 185 F. App'x 208, 210 (3d Cir. 2006) (concluding that officers had probable cause to arrest defendant based on his flight from law enforcement, law enforcement's observation of defendant throwing a gun, and ammunition found in plain view in defendant's car); *United States v. Bonner*, 363 F.3d 213, 218 (3d Cir. 2004) ("By reason of [defendant's] flight in the course of a legitimate traffic stop, the officers had reasonable suspicion to stop him.  Upon effectuating the stop the drugs were revealed [in defendant's hand], giving probable cause to arrest.").